We'll hear argument this morning in Case 18-315, Cochise Consultancy v. United States, ex rel. Billy Joe Hunt. Mr. Boutrous? Mr. Chief Justice, and may it please the Court, the Eleventh Circuit held that a relator who waited seven years to file suit after witnessing an alleged fraud against the United States government was entitled to rely on the equitable tolling principle, the discovery rule, that is established by Section 3731b-2 of the False Claims Act, even though the government declined to intervene in the suit. Under this approach, a relator could conceal from the United States and could wait to sue for a decade and still take advantage of the principle of equitable tolling. This reading of Section 3731b-2 contradicts this Court's interpretive approach in the Graham case. It defies default tolling rules, and it would produce counterintuitive results that Congress cannot possibly have intended. Let me begin with the text. In this Court's decision in Graham, interpreting the False Claims Act, it held that these provisions must be interpreted in context, not in isolation. And in particular, it focused on the language under Section 3730, which is contained in Section 3731b-2. And here the statutory context confirms that that language, action under Section 3730, as incorporated into subsection b-2, is limited to those actions where the United States is a party, either because it's intervened or it filed a complaint. And Graham said Ginsburg. Isn't the United States in some sense a party, even if it hasn't intervened? After all, it's going to get the lion's share of the recovery. And if I understand correctly, the suit can't be dismissed without notice and approval by the United States. The government does have certain rights, Your Honor, when it does not intervene, but it is not a party. This Court held that in Eisen Stat case. And the key here, Your Honor, is if we look at the text of the statute, there are provisions, Section 3731b-2, only refers to the United States. And the statute refers to relators and the United States separately throughout. But it only refers to the United States. And as Judge Wilkinson in the Sanders case from the Fourth Circuit noted, it makes no sense to apply this tolling provision to a relator where the United States is not involved. The language is that the knowledge of the official of the United States charged with responsibility to act in the circumstances triggers the statute of limitations. So knowledge of a third party that's not a party to the case would somehow put the plaintiff who's the relator, who's not an injured party, on notice that there's a claim. It could start the clock ticking without the relator even knowing it. Mr. Boutrous, I understand your argument that a nonintervention case is not a civil action under Section 3730 for purposes of b-2. And the arguments you've just given us, I acknowledge those in your response to Justice Ginsburg. But I believe you still take the position that the very same case is a civil action under 3730 for purposes of b-1. And so you'd have us interpret that introductory language to b in two different ways, one for b-1 and the other for b-2. How do we manage that? That's quite a feat, don't you think? I don't think it's difficult at all, Your Honor. And in Graham, the Court said that the law is not a civil action under 3730 for purposes of b-1. In Graham, we held that retaliation claims just simply aren't covered by this provision at all, and they don't qualify under that introductory language for either purposes of b-1 or b-2. Here, you're asking us to split the baby, as it were, and we normally don't read the same language to mean two different things. And I believe that's the problem you face that we did not face in Graham. Well, actually, Your Honor, in Graham, that exact issue was presented. The Court said in discussing Section 3731d, which at the time was subsection c, that the language action brought under Section 3730 meant only actions brought under the United States in that provision. And the Court said it was the – basically the exact same language in Section 3731b-1, which is what the Court was talking about. The Court said that Congress spoke imprecisely, used the term actions under Section 3730 imprecisely, and it sometimes used that phrase to refer to only a subset of actions under Section 3730. And in interpreting section – subsection d, it said that subset were actions only involving the United States. That's exactly what we're arguing here. So – and the Court has, Your Honor, in many instances interpreted the same phrase in a statute to mean different things. In the utility regulatory error case, for example, the Court said you have to look at what is the language doing in a particular provision, how is it interacting with the other provisions. Here, subsections b-1 and b-2 are very different provisions. It's not like just a word following a defined term. b-1 is triggered by a violation of Section 3739. But just so I understand your argument, and we can put it in a nutshell, then you can move on. You read that language as civil action under 3730 to mean cases where there's no intervention when we come to b-1, but not b-2. Is that right? In b-2, we read it to mean there must – yes, that's correct, Your Honor. There must be intervention under b-2 in Section b-1. So the United States is a party for purposes of b-1, but not b-2, but differently. b-1 does not refer – does not distinguish between the United States and the relator. b-2 does. It specifically calls out the United States, and the statute of limitations is triggered based on the knowledge of the official of the United States charged with responsibility to act under the circumstances. Does that mean, Mr. Boutros, that the statute of limitations can change in the middle of the lawsuit if the government decides to intervene? It doesn't change, Your Honor. For a relator, the statute of limitations would be 6 years after the violation occurred, and that would end it. For the United States, if the relator, for example, sued on its own and the government didn't intervene and it was more than 6 years, the claim would be barred. But that doesn't mean the statute of limitations is changing. The United States would still have the opportunity to intervene, and if it – if the official charged with responsibility to act had learned in less than 3 years before the filing of the suit, the claim would be timely. So the statute of limitations stays the same. I don't think it's at all complicated. But think of the reverse. Here, equitable tolling, and this goes to the default rules, equitable tolling is meant to protect the injured party who is seeking recompense. That's what the Court said in Gabelli when it was talking about civil enforcement penalties brought – sought by the SEC. And this Court said it had never applied equitable tolling or the discovery rule where the government is seeking penalties and not seeking compensation for itself. That's what the relator is doing here. Sotomayor, if you see, the problem I have is that I know that it appears to give the relator more of a statute of limitations than the government. But if you look at this statute more broadly, which is that its purpose is to ensure that when some fraud has occurred against the U.S., that there is recovery for the United States, and the quitam actions, whether it's the relator or the U.S. prosecuting it, the recovery in bulk, as Justice Ginsburg mentioned, goes to the government. So there is a purpose to this, and one that makes logical sense, which is, why should it matter that it's the government's knowledge that it's an issue when it's the government who stands to benefit from a longer statute of limitations? Well, Your Honor, the government would benefit from the longer statute of limitations. It would have the opportunity to do that. No, but you're forcing it to do something that the statute clearly doesn't want to force the government to do, which is you're forcing it to step into the shoes of the relator. But the statute clearly gives the government the option not to. And you're saying, read this in a way that forces the government to do it. Well, it wouldn't be forced, Your Honor. It would consider the fact that the claim would be rendered untimely as part of the suite of factors it normally would consider. Here, the government was not forced into intervening. It decided that based on its evaluation of merits and of costs and other factors, it wouldn't do that. But, Your Honor, it's not just the recovery for the government. It's rapid exposure of fraud. Congress, and this Court said it way back when in the Marcus v. Hess case, the False Claims Act was meant to spur rapid ferreting out of fraud by privateers or bounty hunters or people who were on the scene. This would do the opposite. So it's inconsistent with the purposes of the False Claims Act and with the purpose of statute of limitations, which are meant to do that. Well, no longer, because in 1996, Congress made one of the factors relevant to how much a relater recovers, whether they were dilatory in bringing the action. I know that has little to do with the original interpretation, but that's not a consequence today. They're still a direct incentive. It can have an effect, and I think one of the cases that was cited by the other side showed that there was a modest reduction. But the principle here that a relater, for example, Mr. Hunt waited 7 years, and one of the cases that creates the conflict that brings us here was 8 or 9 years, it is so contrary to the very essence of equitable tolling to allow someone to lie in the weeds and conceal from the United States. Well, that's really more of an academic concern. The relaters, for example, they know if they don't move promptly, another relater might preempt them. They know that if they don't move promptly, the government itself might find out before they have a chance to file, and that would preempt their action as well. The theory of a relater just sort of, as you say, waiting in the weeds, I think, is not a realistic one. Well, Your Honor, that this case proves the opposite. It's not academic. Here the relater waited 7 years. In other cases, in the Sanders case, I think it was 7 or 8 years. But think of it this way. If a relater's case is baseless, if it's a concocted claim, if it can — if it's a meriless claim, those incentives about moving quickly don't spark the relater to do anything. They're better off just waiting, letting damages that they're going to claim pile up, treble damages, and they can amass whatever evidence they have while the defendant has no idea that someone is going to bring this claim. You preface this by saying, if the claim is baseless. So none of that is going to happen if the claim is baseless. Well, but, Your Honor, these false claims act, I think the amicus briefs demonstrate. They do present a problem potentially of abuse, and throughout history, key TAM actions have created such problems. I'm not saying they all are, but what I am saying is that the incentives don't necessarily cause people to file quickly, as this case and many others demonstrate. But the point is, even if the incentives are — there are incentives there, this is another thing that a relater could consider. They can wait. That's flatly contrary to equitable tolling, and that's the background rule that Congress was thinking of. You're not arguing that it would be absurd to read it as Respondent and the Solicitor General read it? We are not. We are arguing that it's counterintuitive, just like the rule in Graham that was counterintuitive. Congress likely did not mean what it said. It seems to be what you're suggesting. No, Your Honor. We mean that Congress did mean what it said, that where the United States official, who's charged with responsibility for filing a timely action when the government It didn't say that. It has a statute. It says civil action, and then it says one or two, whichever is later. It makes no distinction in the text between the United States stepping in as intervener or the G-TAM plaintiff going it alone. Justice Ginsburg, I think we crossed that bridge in Graham. The fact that that language But Graham was a retaliation claim, and there it was a case where to bring a retaliation claim, you don't have to prove there was any fraud at all, just that you were retaliated against. And the retaliation could occur after the statute of limitations ran. So that, if there are absurd results, it seems to me that would fit, that you don't even have a claim that you can sue on until the statute of limitations has already won. That was one aspect of Graham, but the way the Court got there, and the dissent in Graham did not think it was an absurd position, that it was counterintuitive is what the majority said. But, Your Honor, Graham didn't just talk about the retaliation provision, subsection H. It talked about 3731d, that provides in an action under section 30, brought under section 3730, the United States must prove the elements by a preponderance of the evidence. And the Court held that that provision only applied to actions brought by the United States or where they intervened, even though it was even broader. It said any action under section 3730, and the Court held that Congress was imprecise It's not that they didn't mean what they said. They were imprecise. When they Why is this imprecise? It seems very clear. Now, you then argue it doesn't make a ton of sense in terms of the policy objectives, tolling principles. I get all that, but it seems very clear as written. Well, Your Honor, I think that, one, we have to you can only interpret the statute by understanding or viewing the language, action under section 3730, as appearing in both provisions. It really does. It can't be that the decision turns on the fact that, as a drafting technique, Congress said it once, and it goes into two very different provisions. So when we get to section 3731b2, the question is which actions is Congress talking about? And the fact, it's not that it didn't mean what it said, but it was imprecise in the sense that it didn't button down absolutely clearly that a relator couldn't take advantage of that provision. But everything else, common sense, logic, the structure of the provision, the derivation of the Let's talk about common sense. Oh, I'm sorry. No, no, please. Go ahead. Your question is probably better than mine. This common sense we keep coming back to, I guess I'm struggling to get my head around it. Congress, you suggest, wants to encourage relators to act quickly, but it has a number of other tools for ensuring that, as the Chief Justice pointed out. And in any event, it really boils down to these last three years, seven through 10, and whether Congress would have thought that we want relators to, we want to outsource work to relators years one through six, but not seven through 10 for the reasons that we want to encourage relators to act quickly. But couldn't a rational Congress think, well, we want to outsource the work to relators seven through 10 as well. And why is that absurd or unlikely, or why does that defy common sense? I guess I'm just struggling to understand that argument. Because, Your Honor, first, six years is a long time for a statute of limitations for fraud, number one. Number two, we're talking about equitable tolling that is pegged off diligence and that the party who is bringing the case acted diligently. As the Court said in Credit Suisse, it's inequitable to continue to toll a statute of limitations once the plaintiff knows there's been an injury and they have a claim. It's inequitable. So Congress would never have thought that if it was in putting a equitable tolling principle into the statute, that it would allow the plaintiff to just lay back and to file the lawsuit. It's contrary to the very essence of what equitable tolling is. Congress certainly could have wanted to give relators 10 years to file suit. But that's not really the question. The question is, did they want relators to file suit between years seven and 10 in those cases where, A, the government didn't know about the fraud until year seven, and the government chooses not to bring the case on its own? Correct. And that's exactly right, Your Honor. When we're getting to seven and 10 years, the memories are fading, the government that has a special responsibility to ensure justice is done. Statutes of limitations serve important purposes. In Gabelli, the Court repeated that they're vital to the welfare of society. They're important for justice. This is an interesting case because it really does create a statutory interpretation dilemma. This is a terribly drafted statute. It may serve wonderful purposes, but if I were to grade whoever drafted it, anyway, I'm passing it. But you have a real problem in trying to fit this into the statutory text. The other side, I think, has a real problem if they want to argue that their argument makes that Congress really, anybody in Congress really intended the result that they're advocating. So what's your best shot at fitting this into the statutory text? My best shot, Your Honor, is that the language action under Section 3730 is incorporated into Section 3731b-2, and that provision is triggered when the official who is charged with responsibility to file a timely action had knowledge, and they must do so within three years. And that's what the Fourth Circuit said in Sanders. It can only mean that we're talking about a case where — it cannot only mean, I agree with you, this statute's a mess, but a totally reasonable meaning is that it means that that's the official who was charged with getting a timely claim on file, a timely action under Section 3730. And to say that it's the relator, when in the history of this country, we've never had a statute of limitations discovery rule triggered by the knowledge of a third party, or we've — and we've never had this Court apply the discovery rule to someone seeking penalties on behalf of an uninjured — an injured third party, that was Gabelli. Here the relator is in that role. I mean, these are — Well, I mean, these types of actions aren't exceptional in many, many ways, but the question is, are they sufficiently addressed with a 10-year statute of repose? No, Your Honor. Ten years is a lifetime when we're talking about litigation. Six years is a long time. And in these cases, the Washington Legal Foundation brief documents how the government will sometimes — will come in when they get the complaint, the complaint will remain under seal, and it will seek extension, extension, extension. Here it was over a year. So it can be 10 years. It could be 12 years. So 10 years in civil litigation, memories fade. People — witnesses die. They disappear. And so that is — the difference between 6 years and 10 years is a — is a very long time. And going back to — Well, we have quite a few cases that started, you know, 10 years ago. But they weren't filed at the 10-year mark. They were filed, and they — they go through all sorts of processes, and you can take discovery, and you can find out the information, and the litigation has commenced. And back to Justice Alito's question about my best argument, the other piece of it is we know that Congress adopted this tolling provision directly from Section 2416, which is the tolling provision that only applies to actions brought by the United States in tort and contract actions. So that's another, I think, flashing red light, that at a bare minimum, this language is not clear. It's as ambiguous as the language was viewed to be in Graham. And then the question is, what is it most likely that Congress intended? What did it — Well, the State — the States have an amicus brief that says no State has a statute of limitations that explicitly adopts the rules reflected in — the rule reflected in Petitioner's torture interpretation of the FCA. It is Petitioner's proposed rule, not the FCA's plain meaning, that it's absurd. So that is from 20 States. Your response to their assessment? Their assessment really has no bearing on what Congress intended in 1986. And some of the — Their assessment does have some bearing on how we think about how it fits into the overall context of these kinds of cases, and that's been really the thrust of your argument, I think. Well, I think that the — it does not have any bearing. I think it's incorrect, because, again, I go back to the point that it's not equitable, it's not fair, it's — it's contrary to the purposes of the False Claims Act, which are meant to incentivize in all ways relators coming forward. So I — we simply disagree with that assessment. There's — there's — and I didn't see any real clear examples in — in that briefer from the government that our rule would cause any problems whatsoever. Our rule is consistent with history.  And in basic principles governing statutes of limitations, the — But it seems to me that, you know, this statute reflects a Congress that just decided that it did not want the government's decision whether to intervene to affect the statute of limitations. And that might be a bad policy choice, but — but it's — it's — you can imagine reasons why Congress would have made that choice just to say, look, we actually think that this is a very special kind of case, and we want to, you know, have a statute of limitations, that it's true, it's not — it's not ordinary for a rule like this to be triggered by a third party, but this is a special kind of third party which is going to get most of the money from the suit. And we actually think it's just easier, simpler, better for any number of reasons But nothing turned on whether the government intervenes or not. Theoretically, Congress could have thought through that carefully, Your Honor, and gone through that analysis, but there's no indication that it did. Well, the indication is that they wrote a provision where nothing turns on intervention. Well, Your Honor, I would respectfully submit that it's ambiguous, it's not clear, because the Congress used the language action under Section 3730 imprecisely, sometimes referred to subsets of those claims, and here it's the actions by the only party mentioned in the provision. But why do you — why do you argue that B-2 applies when the government intervenes? Why don't you just argue that B-2 applies only when the government itself brings suit? That would be another way to look at it, Your Honor. I think that the government ultimately files a complaint in intervention if it intervenes, and then that relates back, so I think it gets us, you know, to the same place. But I do think that it's really over-reading Graham to suggest that this has been decided, that action under Section 3730 necessarily covers B-2. The court — the government repeatedly cites and quotes Graham, suggesting that the court held that. But it leaves out the fact that the court very carefully said the text of Section 3731b-1 means all actions. Where's the ambiguity? I'm not seeing ambiguity. Where exactly is the phrase that you think is ambiguous? Well, it's a combination of things, Your Honor. It's, as Graham said, Congress used that language action under Section 3730 imprecisely to refer to different groupings of cases. And when we look at that language as incorporated into B-2, and the only party referenced there is the United States, and it's triggered off the official United States charge with responsibility to act, we say the better reading is that that means it's an action where the United States brought the action or intervened in the action. The government is reading in the notion that the decision to act, the Responsibility Act, includes the decision not to act, which we think is not clear from the text. So it's ambiguous. If it's not ambiguous, then I don't think there is a statutory interpretation canon any longer that says we can conclude that Congress didn't mean what it said. The only avenues are the absurdity canon or maybe Scribner's error, but you're not arguing any of those. So if we conclude that it's not ambiguous, is there anything left? There is, Your Honor. The Court's decision in Barnhart, which Respondents cite in their brief at page 20, says that if the text is – if the inquiry ceases if the statutory language is unambiguous and the statutory scheme is coherent and consistent, this statutory scheme is neither of those, and I'll reserve the rest of my time. Thank you, Your Honor. Thank you, counsel. Mr. Mayfield. Mr. Chief Justice, may it please the Court. Section 313731B is an event-based statute of limitations that makes no distinction as to the party to whom it applies. It applies equally to both the United States and to relators who bring suits on behalf of the United States. In keeping with this Court's decision in Vermont Agency, in every case, the real party in interest is the United States. And as many Justices have just recognized, at all times the United States maintains ultimate control over the suit, and it is the ultimate beneficiary of the suit. Approximately 70 percent of KETAM suits are initiated by private relators. The Department of Justice intervenes in only about a fifth of those. But in every case where the result is successful, either by settlement or by judgment, the United States is the ultimate beneficiary. In every case, the United States gets at least 70 percent of the proceeds. And this is in keeping with the entire rational purpose of the statute, which, as a number of the Court members have noted, is the only reason to deviate from the plain language of the statute. Well, Counsel, your argument would have a lot more appeal if we didn't have Graham County knocking around out there. So what do we do about that? You're encouraging us to read that introductory language to the statute to mean what it seems to mean. Yes, Your Honor. But in Graham County, we held it didn't mean what it seems to mean. It wasn't as plain as we – as you argue. So what's your best argument for addressing – how would you have us best distinguish Graham County? Yes, Justice Gorsuch. In Graham County, we had the anomalous situation where Congress simply forgot to provide an applicable statute of limitations to the retaliation provision that it had added in 1986. If one reads Part B.1 and Part B.2, both of those refer by their terms to false claims. A retaliation suit is not a false claim, nor, under the 1986 amendment, is the United States ever a party to a retaliation suit. It is brought solely by the private person retaliated against. So we had an ambiguity there. And the Court recognized that ambiguity. It had to choose between either the 6 years, which was the only solid number that was presented in terms of years at B.1, or, on the alternative, the default statute of limitations that the States had, which is the avenue the Court took. But here, by contrast, we have plain language that applies on its face, a civil action under 3730. It doesn't differentiate whether or not a party is intervening, which the Congress could easily have done. In point of fact, the Congress did do so. In the very next section, in Part C, it says, if the government elects to intervene and proceed with an action under 3730B, Congress could have simply taken that phrase and put it at the beginning of Part B.2. That is what Petitioners are asking the Court to do today. But as this Court has repeatedly held, that's improper, because there is no absurdity. The absurdity here would be if the statute didn't result in the United States obtaining more funds. Or if there was some anomalous result. But even Petitioner admits that their reading, the literal one, results in an outcome where, as they said at the very end of the reply brief, the government obtains more money. That was the point of the 1986 amendments. This Court has said in both Clark and Reno that when looking at statutory provision, if that provision uses the same term in the very same sentence, it means the same thing every time. Statutes are not ephemeral. They are not shapeshifters. We do not give them different meanings because we would prefer a different outcome. Roberts. Your friend relied on the, if I'm remembering right, the United Air Regulatory case. Yes, Your Honor. How do you distinguish that? Your Honor, well, in this case, we have a mechanism by which the Department always screens the cases. It's somewhat unique. The relevant official of the United States is always going to be a member of the Department of Justice. Very few other statutes act like that. In Vermont Agency, the Court pointed out there were four key town statutes. But in this case, the Department, the official charged with responsibility is a designee of the Attorney General. Other statutes don't function like that. But there is a good reason for this, and that is Congress wanted the Department to have the first bite of the apple, to qualitatively pick the very best cases, to have the optimal use of the Department's resources. And then, when the Department decides not to intervene in those cases where it makes that decision, we have these other cases on the side, the vast majority of them, as it would happen. And the question, which Petitioner never answers, is why would Congress want those cases to go fallow? Why would it want those frauds to go unredeemed? And Congress could have done a lot of things. It could have done other things so that those could be actionable. It could have had a 10-year statute of limitations for everybody. It could have had a discovery rule for the relator. Now, let me give you two cases, and you explain to me why Congress would have wanted a different result in these two cases. Case A, government does not want to intervene in the case, it knows about the fraud before year 7. Case B, government doesn't want to intervene, it doesn't know about the fraud before year 7. What is the reason for allowing B to go forward but not A? Your Honor, in all cases, the tolling provision would act to a defendant's benefit. So if the defendant could litigate the issue at the outset of the lawsuit and prevent the case from going forward, if it could show the government had not acted in a timely manner, be it based on real knowledge or constructive knowledge. But within that scheme, let's take year 7, if the government didn't act in year 7 and the relator brought the suit, at any time after that, the United States would still have the option of taking over the lawsuit. The intervention is always available to the government. It doesn't depend on when the relator brings the suit. Alitono, the government could always bring this within 10 years, could it not? It would depend, Your Honor, on the tolling provision. If its actor, the relevant government official, for instance, an AUSA or someone in the civil division, had known about the lawsuit, then no. Right, okay. But I still don't quite understand your reason for saying Congress would have treated those two cases differently. Well, the reason, Your Honor, it's both to spur the Department, the 86 amendments to make clear that the Department said it wanted more time because these frauds were often hidden. But it also put an hour limit on it. Congress could have said 5 years or 10 years for the tolling provision. It thought 3 was reasonable. But that also, Your Honor, affects relators. For instance, a relator might have an impediment to bringing a suit, such as not knowing about the False Claims Act. Well, then you have a discovery rule for the relator. Which Congress elected not to do, Justice Alito. Right, exactly. And so the question is, why would that be rational? And the reason it would be rational, Your Honor, is because the government ultimately benefits from the relator's action. If there is no knowledge issue and the relator is timely, he brings a suit, the government gets the money. Yeah, I understand the government benefits, but that would argue in favor of a 10-year statute of limitations. If the government chooses not to bring suit, why does it matter whether the government knew about this fraud before year 7 or didn't know about it before year 7? That's what I'm trying to get at. I think Congress created a balancing to protect defendants, Justice Alito. I mean, this doesn't allow every suit to go forward. If the department, if the relevant government official knows in, say, year 6 and doesn't act, for whatever reason, the department may decide its resources are about somewhere else, it may decide that this case isn't meritorious. And let's say the relator then brings the suit. The Congress, rather, the department can always change its mind. It could, in year 10, if the case is still going on, come in and take it over, and that is to its benefit. But if the three-year tolling applies, because if we want defendants to get a protection against the department sitting and doing nothing, the department was the institutional actor that testified before Congress, and Congress said, okay, we're going to give you more time than you had before, but you've got to do something. You can't just not do anything once you know about it. But the department wouldn't have that option if it didn't know. And as the number of justices pointed out, a relator has every incentive to bring it to the department's attention quickly, although the relator may not be the only person who provides that information. It could well be a witness. It could be an audit by the government. But why didn't your client bring it to the government's attention, sir? It's not in the record, Your Honor, but my client was first, he was serving in Iraq. Second, when he got back to the United States, he was not aware of the False Claims Act, but then he was arrested. And at the time of his arrest, he told the FBI about facts regarding this fraud, which was different from the matter that then resulted in him going to jail. Sotomayor, what inducement is there? I'm taking that you're agreeing with the United States that officials of the United States, you believe, also are just the Department of Justice. That is correct, Your Honor. Sort of interesting that this statute doesn't define who officials are. I don't know where you get it other than pointing to other statutes, but that wasn't dealt with below. What inducement is there for the FBI to pass the information to the right officials? And how do we know in this case it wasn't done, that there wasn't a U.S. attorney that this was discussed with in some way? Well, ultimately it was, Your Honor. That happened after the initial meeting with the FBI. It's not in the record again because that was not developed and the court below did not consider it to be particularly relevant. But it's for that reason, Your Honor, that the official charged is cabined to the Department of Justice. If it could just be any government official, then that screening process that Congress designed wouldn't act. There isn't anyone in the FBI or the OIG or the contracting agency who's responsible for protecting the government's rights. The attorney general, however, in Section 3730A, is the individual specifically charged with the statute to investigate every case. It's a nondiscretionary duty. So why didn't Congress reference that? Why didn't they, instead of just saying official of the United States, saying official designated under the subsection you just mentioned? We don't know, Your Honor. We don't know why they did that, except that they did borrow – Justice Alito's point that it's poorly written. I think that's fair, Your Honor. It is poorly written, which is why there are a plenary – a rather plethora of these cases coming to the Court. But they did borrow that. I think there was some shorthand from 2416, as my colleague pointed out. But they borrowed only the tolling provision under 2416. They did not borrow the party limitation under 2415. So if, as Petitioners would have it, Congress had meant this provision to somehow apply only to the United States, they would have borrowed from 2415 and said, in actions brought by the United States. But they didn't do that. The plain language says it's a civil action under Section 3730. So having written it that way, the question is why would we deviate from that? Is the outcome absurd? It is not. And since there is a rational basis, even if any of us in here might have taken a different path in designing the statute, that is the outcome that prevails. And what happens if a relator brings a suit, the government chooses not to intervene, but then as the suit goes on, it appears that the relator is not fulfilling — is not litigating the case in a diligent way? What can the government do at that point? Justice Alito, the statute specifically provides for that, because at any time, the Department of Justice can dismiss the False Claims Act suit. Or in the alternative, which also happens, it can take it over. It can do a — there are — although it does not happen frequently, there are occasions where the Department looks at a suit that's been in the system for some years and says, you know what, we will take that over after all. So the relator does have some responsibilities with respect to the prosecution of this suit in the name of the United States? Only with respect to his relationship to the Department. For instance, if the Department requests that he be forwarded pleadings, or if the Department asks that discovery be truncated in some way, those are his responsibilities. No, no, that's not my point. This is an action in the name of the United States, correct? That's correct. The relator is, in effect, representing the United States. And the relator has responsibilities in that case? Otherwise, the government can intervene and take over the case? The government always has the ultimate ability to take over the case, Justice Alito. The relator is basically a free agent within those statutory constraints. Yes, well, what I'm getting at, I'm sure you realize this, is why doesn't that suggest that the relator has, is charged with responsibilities to act in the circumstances? Because under no circumstances could the relator, who has taken no oath to the Constitution, is not employed in any way by the government, and is not answerable to the government during the course of the litigation, in terms of if he decides to take witness A or to ask for specific documents. He's not carrying out a government policy to differentiate from Dixon, which the Petitioners relied on. In that case, you had individuals who, by contract, were dispensing Federal housing funds. Yeah, well, are you arguing that Vermont agency was incorrectly decided? Not at all, Your Honor. It's just simply the degree to which the assignment gives the government agent, in this case, free reign. The ultimate outcome of the case, whether or not it's dismissed, intervened, or settled, is always up to the government. The government always gets to make that decision, and over the relator's objections, if it so chooses. But in terms of if it doesn't intervene, the relator can act like a normal litigant and make his own tactical decisions. But he's not an officer in any meaningful sense, because he cannot obligate the United States. If he signs a contract, he's not doing so on behalf of the United States. No one would believe he was. He's carrying out no statutory duties, and he is not answerable, ultimately, to anyone in the Department of Justice. If my client decided today that he wanted to walk away from this case, he could. There's no one to make him do it, and the only thing that could save it is if the Department took it over. Mr. Mayfield, am I right that in certain circumstances, this statute actually gives the relator a longer statute of limitations than the government has? In other words, take a case where the government finds out on day one about a fraud. The government, as I read the statute, then has 6 years. But if the relator finds out on day one about a fraud and thinks it's the kind of fraud that the government or nobody else will ever find out about, then that relator can sit on his rights for 10 years. So the relator actually gets 4 more years than the government itself does. Is that right? And if it's right, why on earth does it make any sense? It's a hypothetical that's not likely to happen in the real world, Justice Kagan, but it is hypothetically right. But at all times, the government could still take over the case. Let's say the relator in that case waits until year 10, files. At that very moment, the government can intervene. If the relator takes another 5 years to litigate that case and we're in year 15, the government can intervene. It's always the government's case. At no point does a relator have greater rights than the government. Does that make sense? Roberts. I suppose the government can also find a relator, right? It could if it were that diligent, Your Honor. I mean, just short of year 10. If it were so inclined, it could, Your Honor. And if let's assume that the United States had a malign motive, it could also sit on its rights for 10 years and then pretend it didn't know, which is really the fallacy of Petitioner's position, which is the assumption that relators are sometimes always acting based on malign interests, but the government is always noble. But let's assume they're both revenue maximizers. The government could sit on its rights. Every harm that Petitioners point to exists in a scheme in which relators play no role. The same discovery occurs in terms of what the government knew and when it knew it. And the government always – I don't know if that's more or less academic than your friend's hypothetical, but it certainly is academic that the United States would allow fraud to be continued to practice for, you know, 9 years and 300 days or whatever. Mr. Chief Justice, it's actually probably more likely, but the reason would be different. It might not necessarily be malign. It might be a lack of resources. But we know, indeed, that was what instigated the 1986 amendment, that the Department frequently finds itself unable to timely respond to these kinds of frauds. And often doesn't know. Again, 70 percent of these cases are brought by private relators. The Department and its associated agencies simply lack the investigative power to discover all these frauds. So it's in the government's interest for the relator to do it. If you have that bad actor who waits until year 10 and assumes all along the way that the government doesn't otherwise know, which is a foolhardy assumption on the part of a relator, because the relator doesn't know what investigation the government's doing on his own, he doesn't know if another whistleblower is coming forward, he doesn't know if another witness who doesn't want to be a relator is going to come forward. He controls none of these things. He does not control the government's internal knowledge or decision-making power. The only thing he controls is whether or not he comes forward. And if someone else beats him to it, he's out of luck. So it would be foolhardy for him to do it, and it would be malpractice for any attorney to recommend that he do it. But even if, even if someone decided to take that insane gamble, at the end of 10 years, whenever that suit gets filed, and let's assume the suit is successful, he can walk into court, and the United States can say, when they try to settle the case, that relator sat on his rights. We don't think he deserves the full 30 percent, and the court can knock it down. So on both ends, Congress has built a statutory scheme that confines the very harms that petitioners raise here, harms that they can't really point to exist in the real world, because virtually all relators bring their suits as quick, soon as they get a to identify the fraud and bring it forward, because otherwise they may lose. They'll lose everything. It would be like taking a lottery ticket and dropping it in the toilet. No one does that. And at the end of the day, every time a relator acts, no matter when he does it, whether it be year 1, year 5, or year 10, it is the government that ultimately benefits. Thank you. We urge the affirmation of the decision below. Thank you, counsel. Mr. Guarneri. Mr. Chief Justice, and may it please the Court. I'd like to begin by addressing a question that Justice Kagan posed to Mr. Mayfield. In our view, the correct interpretation of the statute mandates that the relator and the United States always have the same deadlines for filing suit. The six-year limitations period in B-1 and the three-year tolling rule in B-2 will expire on precisely the same date for both a potential relator and for the United States. So under the correct interpretation of the statute, a relator could never bring a timely action unless the United States could also bring an action on the same day alleging the same fraud. The second point I'd like to address, Mr. Boutros alluded repeatedly earlier to principles of equitable tolling. What's the textual basis for that? Both paragraphs B-2 and paragraph B-1 both apply to a civil action under Section 3730. So in any case, a court, the tolling rules will be identical whether or not the United States initiates the suit, the United States intervenes in a suit initiated by a relator, or the United States elects not to intervene in a suit initiated by a relator. The statute itself draws no distinction between those three categories of cases. And therefore, we think the tolling rule and the six-year limitations period in B-1 will operate in the same way in all of those suits. Kagan. Yeah, I guess my hypothetical was a slightly different one. It was supposing that the Federal Government knows on day one of the fraud, it gets six years to bring the fraud, right? That's correct. But then I changed the case essentially and said, well, now we're dealing with a different case, and in this case, the Federal Government doesn't know of the fraud. Instead, the relator knows of the fraud on day one, and assuming that the government remains in blissful ignorance and everybody else does, too, he gets 10 years. Isn't that right? That's correct. We think that that's how the statute would operate. Now, the relator in that sense would also have more of the six-year period to bring the suit. If the relator learns of the fraud on day one, the relator will have more of those six years in which to file a suit than the United States will have. We think that's of no consequence. It's Congress adopted a different form of parallel treatment. And the form of parallel treatment that Congress adopted ensures that the deadlines expire for both the United States and the relator at exactly the same point in time. As I began to say earlier, Mr. Boutros alluded repeatedly to principles of equitable tolling, the kinds of principles this Court encountered in the Gabelli decision and in Credit Suisse. There is no occasion here to resort to principles of equitable tolling because there is a statute on point that dictates the tolling rule that applies in cases like this one. And for all the reasons that have already been discussed this morning, the statutory text makes that tolling rule applicable even in a non-intervened suit. There's also been significant discussion this morning of this Court's decision in Graham County. Graham County interpreted the exact same language that is at issue here, that is the phrase a civil action under Section 3730 as used in 3731B to refer to a subset of civil actions under the False Claims Act. But the subset that the Court identified in Graham County includes a non-intervened suit just like this one. The Court interpreted that language to refer to suits under 3730A or B alleging a violation of 3729. This is such a suit. This suit falls into that category regardless of whether or not the United States elects to intervene in the action. There's also been some discussion about why this was a sensible policy result. We think the key thing to keep in mind in that respect is that a relator is permitted to sue to vindicate an interest of the United States. The United States is the injured party in all of these cases. The United States is a real party in interest regardless of whether or not it elects to intervene in the action. The majority of any recovery would go to the United States. And in that context, it made good sense that Congress chose to make the tolling rule in favor of the injured party, that is, the United States. Now, if the government decides it doesn't want to intervene, what difference does it make whether it knew about this fraud or not? That's what I just can't understand. Congress chose to make the tolling rule applicable based on the knowledge of the United States. We think another way to pose a similar question, Justice Alito, would be why should the United States be deprived of the assistance of a private relator during that three-year tolling period? Petitioners have yet to identify a sensible reason Congress would have wanted to deprive the United States of the assistance of the relator during those years. The logic and the structure— Well, it deprives them of the assistance of a relator during those years if the government knew about this on day one. That really doesn't answer my question. If the government knows about the fraud on day one— Right. Congress made a reasonable decision that the tolling period would extend only three years from that point in time. But the same is true for a relator. A relator could not rely on the tolling provision to bring a suit after those three years have expired. It's a reasonable policy choice that's reflected in clear statutory text here. All the Court needs to do here is follow the statute as written and apply the language of B using the same construction it applied in Graham County. If there are no further questions, I'd be happy to yield the balance of my time. Thank you, counsel. Three minutes, Mr. Boutros. Thank you, Your Honor. I will begin with the last point that the United States has made. They made it in their brief repeatedly, and it's just incorrect. The Court did not in Graham hold that the language action under Section 3730 meant the same thing in B-1 and B-2. On page 421 and 422, which is what the government keeps citing, the Court began its sentence with Section 3730-B-1's text. It's talking about the text of that particular provision. And if you look at the analysis on page 418, where the Court was specifically talking about the virtually identical language to what we have here in subsection D, which was then C, the Court made exactly the point we are making. That provision only referenced the United States, and the Court said that Congress used that phrase, action under Section 37, imprecisely, sometimes to only refer to subsets of those actions. And that's what it did here. The United States is ignoring, I didn't hear one word about the purposes of statutes of limitations from anyone on the other side. Statutes of limitations serve valuable purposes. They spark action quickly and more quickly, and they're meant to protect defendants, allowing a rule that allows tolling after – basically, this is self-tolling. The relator can just decide to press the button and toll the statute of limitations and then let it loose, and it goes – that's – Congress would not have intended. It's implausible that it would have intended that. I'd like to briefly address the point, Justice Sotomayor, you were making, and it's really our alternative argument, about the official of the United States. I don't see why the United States should – and the Respondent should have it both ways. They say the relator stands in the shoes of the United States. The relator should – everything should be the same between the relator and the United States. If that's the case, then I think our alternative argument is very appealing, that where the government doesn't involve – doesn't intervene, and the inter – the relator is acting under this Court's decision in Stevens as the designated agent of the United States, and it's not an assignee when it's pursuing penalties on behalf of the United States and damages for the United States. It's the agent. It's the prosecutor. Sotomayor, the use of the word officer is very different than a representative. It actually – Sotomayor, even agent, those are substantially different concepts. And so I do think the word official sounds – means what it sounds like, an official and not a representative. Well, Your Honor, I would point to this Court's decision two years before the 1986 amendments in United States v. Dixon, a criminal case, where the Court held that the words public officials under the Federal bribery statute encompassed private corporate officers who were performing public responsibilities. And here, it's not fair to say that the – that the relator is just on his own when the government doesn't intervene and then argue that our rule is wrong because the relator is doing this important work for the government. It's acting as the agent for the government. Agent is a different word than official. But it is, Your Honor. But an agent who is performing official responsibilities, I think their knowledge should be imputed to the government. Thank you very much. Thank you, counsel. The case is submitted.